1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  GREGORY A. OTT
   Deputy Attorney General
5  LINDA M. MURPHY, State Bar No. 148564
   Deputy Attorney General
6    455 Golden Gate Avenue, Suite 11000
   San Francisco, CA  94102-7004
7  Telephone:  (415) 703-1334
   Fax:  (415) 703-1234
8  Email:  Linda.Murphy@doj.ca.gov

9  Attorneys for Respondents

10             IN THE UNITED STATES DISTRICT COURT

11           FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                  SAN FRANCISCO DIVISION

13
   **DANIEL ALAS,**                              C 07-3811 SI
14
                                   Petitioner,
15
             **v.**
16
   **WILLIAMS SULLIVAN, et al.,**
17
                                   Respondents.
18

19
       **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER**
20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

STATEMENT OF THE CASE    1

STATEMENT OF FACTS    2

STANDARD OF REVIEW    5

ARGUMENT    6

I.    THE TRIAL COURT DID NOT VIOLATE PETITIONER'S RIGHT TO PRESENT A DEFENSE OR RIGHT TO A FAIR TRIAL BY PRECLUDING HIM FROM INTRODUCING TESTIMONY OF AN EXPERT WITNESS FROM PETITIONER'S PRIOR TRIAL WHERE A FOUNDATION HAD NOT BEEN LAID    6

II.    PETITIONER HAS FAILED TO SHOW TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO REQUEST THAT A REDACTED VERSION OF BASELT'S TESTIMONY BE ADMITTED OR TO SECURE AN ALTERNATE EXPERT TO TESTIFY    9

III.    PETITIONER IS PROCEDURALLY BARRED FROM RAISING HIS THIRD CLAIM; MOREOVER, THE TRIAL COURT'S ISOLATED REMARK TO DEFENSE COUNSEL DID NOT VIOLATE PETITIONER'S RIGHT TO A FAIR TRIAL    12

IV.    THE TRIAL COURT DID NOT VIOLATE HIS DUE PROCESS RIGHTS IN RESPONDING TO THE JURY'S REQUEST FOR A DEFINITION DURING DELIBERATIONS    15

CONCLUSION    18

1

# TABLE OF AUTHORITIES

2

**Page**

3    **Cases**

4    *Bell v. Cone*
     535 U.S. 685 (2002)                                                        9
5
     *Bonin v. Calderon*
6    59 F.3d 815 (9th Cir.1995)                                                13

7    *Brecht v. Abrahamson*
     507 U.S. 619 (1993)                                                    6, 17
8
     *Calderon v. Coleman*
9    525 U.S. 141 (1998) (per curiam)                                          17

10   *Carey v. Musladin*
     ___ U.S. ___, 127 S. Ct. 649 (2006)                                    5, 13
11
     *Chambers v. Mississippi*
12   410 U.S. 284 (1973)                                                        8

13   *Clemons v. Mississippi*
     494 U.S. 738 (1990)                                                        8
14
     *Duckett v. Godinez*
15   67 F.3d 734 (9th Cir.1995)                                                14

16   *Early v. Packer*
     537 U.S. 3 (2002) (per curiam)                                             5
17
     *Estelle v. McGuire*
18   502 U.S. 62 (1991)                                                         7

19   *Fay v. Noia*
     372 U.S. 391, 440-441, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963)                 17
20
     *Fry v. Pliler*
21   127 S.Ct. 2321 (2007)                                                      6

22   *Gayle v. Scully*
     779 F.2d 802 (2d. Cir. 1985)                                              14
23
     *Korsak v. Atlas Hotels, Inc.,*
24   2 Cal.App.4th 1516 (1992)                                                  6

25   *Kotteakos v. United States*
     328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)                    17
26
     *LeGrand v. Stewart*
27   133 F.3d 1253 (9th cir. 1998)                                              8

28

**TABLE OF AUTHORITIES** (continued)

Page

*Lewis v. Jeffers*
497 U.S. 764 (1990)                                                      7, 8

*Lockyer v. Andrade*
538 U.S. 63 (2003)                                                          5

*Maurino v. Johnson*
210 F.3d 638 (6th Cir. 2000)                                               14

*McDowell v. Calderon*
130 F.3d 833 (9th cir. 1997)                                               17

*Melendez v. Warden*
288 F.3d 1120 (9th Cir. 2002)                                             13

*Montana v. Egelhoff*
518 U.S. 37 (1996)                                                          8

*Morris v. Woodford*
273 F.3d 826, 839 n.4 (9th Cir. 2001)                                     18

*Paulino v. Castro*
371 F.3d 1083 (9th Cir. 2004)                                             13

*People v. Cash*
28 Cal.4th 703 (2002)                                                     13

*People v. Fudge*
7 Cal.4th 1075 (1994)                                                     13

*People v. Hayes*
172 Cal.App.3d 517 (1985)                                                  7

*People v. Kageler*
(1973) 32 Cal.App.3d 738                                                  15

*People v. Kraft*
(2000) 23 Cal.4th 978                                                     16

*People v. McCleod*
(1997) 55 Cal.App.4th 1205                                                16

*People v. Mendoza Tello*
(1997) 15 Cal.4th 264                                                     10

*People v. Solis*
(2001) 90 Cal.App.4th 1002                                                16

*People v. Zapien*
(1993) 4 Cal.4th 929                                                     10, 11

**TABLE OF AUTHORITIES** (continued)

**Page**

*Richardson v. Newland*
342 F. Supp. 2d 900 (E.D. Cal. 2004)                                    13

*Rock v. Arkansas*
483 U.S. 44 (1987)                                                      7

*Schouten v. Crawford*
(1953) 118 Cal.App.2d 59                                                15

*Strickland v. Washington*
466 U.S. 668 (1984)                                               9, 12, 13

*Taylor v. Illinois*
484 U.S. 400 (1998)                                                     8

*United States v. Liteky*
510 U.S. 540 (1994)                                                     14

*United States v. Miller*
546 F.2d 320 (9th Cir. 1976)                                           17

*United States v. Mostella*
802 F.2d 358 (9th Cir. 1986)                                           13

*United States v. Scheffer*
523 U.S. 302 (1987)                                                   7, 8

*United States v. Span*
170 F.3d 798 (7th Cir. 1999)                                           17

*Villafuerte v. Stewart*
111 F.3d 616 (9th Cir. 1997)                                           14

*Weeks v. Angelone,*
528 U.S. 225, 120 S.Ct. 727,145 L.Ed.2d 727 (2000)                 17, 18

*Williams v. Taylor*
529 U.S. 362 (2000)                                                    5

*Woodford v. Visciotti*
537 U.S. 19 (2002) (per curiam)                                        5

*Yarborough v. Gentry*
540 U.S. 1 (2003) (per curiam)                                         9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES  (continued)

**Page**

**Statutes**

United States Code, Title 28
      § 2244(d)     14
      § 2254(e)(2)     11
      § 2254     6
      § 2254(d)     5, 9, 12
      § 2254(d)(1)     13

California Evidence Code
      § 803     6

California Penal Code
      § 187     1
      § 667(a)     1
      § 667(b)-(i)     1
      § 1138     16
      § 12022(b)(1)     1


**Other Authorities**

California Jury Instructions, Criminal
      No. 8.11     15, 16, 18
      No. 8.30     16
      No. 8.31     15, 16, 18
      No. 8.40     15-17
      No. 8.45     15
      No. 8.50     15, 17
      No. 8.72     15, 17
      No. 8.75     15, 17

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  GREGORY A. OTT
   Deputy Attorney General
5  LINDA M. MURPHY, State Bar No. 148564
   Deputy Attorney General
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
7  Telephone: (415) 703-1334
   Fax: (415) 703-1234
8  Email: Linda.Murphy@doj.ca.gov

9  Attorneys for Respondent

10                IN THE UNITED STATES DISTRICT COURT

11              FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                     SAN FRANCISCO DIVISION

| | |
|---|---|
| **DANIEL ALAS,** | C 07-3811 SI |
| Petitioner, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER** |
| v. | |
| **WILLIAMS SULLIVAN, et al.,** | |
| Respondents. | |

## STATEMENT OF THE CASE

On May 24, 2004, a jury convicted petitioner of second degree murder (Cal. Penal Code § 187) and found that he personally used a deadly weapon in committing the murder (Cal. Penal Code § 12022(b)(1)).  CT 227, 230; RT 539-40.  Additionally, the trial court found true petitioner had a prior strike conviction (Cal. Penal Code § 667(b)-(i)) and a prior serious felony conviction (Cal. Penal Code § 667(a)).  CT 230; RT 538, 565-66.  On June 15, 2004, the trial court sentenced petitioner to 36 years to life in state prison.  CT 341-431; RT 579-82.

On August 9, 2004, petitioner timely appealed his conviction.  CT 345.  On January 30,

1   2006, the California Court of Appeal, First Appellate District, affirmed the judgment. *See* Exh. D.

2   On March 9, 2006, petitioner, represented by counsel, sought review in the California Supreme

3   Court. *See* Exh. E. On April 26, 2006, the California Supreme Court denied review. *See* Exh. F.

4      On July 25, 2007, petitioner, represented by counsel, filed a petition for writ of habeas

5   corpus in this Court. On July 31, 2007, this Court issued the Order to Show Cause.

6   **STATEMENT OF FACTS**

7   Trial Evidence

8      The Court of Appeal summarized the facts of the case as follows:

9      At approximately 11:00 p.m. on November 21, 1998,[FN1.] defendant and his brother
Richard were outside the Roaring 20's strip club on Broadway in San Francisco. Tawn

10  Klugman, an employee of the club, and two young customers, Brian Elder and Rick
Clayton, were also outside. Defendant and his brother were apparently trying to get into

11  the club and Richard grabbed Klugman's buttocks. She responded, "Don't touch me." A
dancer who was close by also told him not to touch any of the girls. Defendant explained

12  that Richard was his brother and that he did not know what he was doing.[FN2.]

13     [FN1.] All further references are to calendar year 1998, unless otherwise indicated.

14     [FN2.] Evidence was later introduced that Richard Alas was involved in an
automobile accident on November 21, 1983, and suffered a fractured vertebra and skull,

15  and was in a coma for 32 days.

16     Elder and Clayton believed that defendant was stopped by an employee after
defendant tried to enter the club without paying and with beer in his hand. Elder said,

17  "why don't you take off?" A confrontation ensued between defendant and Elder and
Clayton, with defendant taunting them and encouraging them to fight. Defendant was very

18  angry and according to Clayton, "the only thing he was looking for, was a fight." Richard
tried to diffuse the situation and pull defendant away, but defendant refused to leave.

19  Richard eventually walked away. Klugman went into the club and told the disc jockey to
get the manager. Anton Segal (the greeter/doorman/bouncer at the club) came out and saw

20  the developing situation. He put his hand on defendant's shoulder and tried to take care
of the situation calmly. He told defendant to leave and to return when he was sober.

21  Defendant brushed off Segal's hand and grew angrier and violent. Clayton had described
the brush as a "hit" and Klugman described defendant as pushing Segal. Segal removed

22  his watch, as if to defend himself, and defendant walked away, shouting. Elder and
Clayton went back into the club; Klugman went to the Condor Club next door to get the

23  security guard to assist.

24     Elder and Clayton both smelled alcohol on defendant's breath. Elder noticed that
defendant was beginning to slur his words, but neither had any difficulty understanding

25  defendant. Defendant appeared drunk and his gait was unsteady, but his motor skills
otherwise appeared unimpaired. He had no difficulty walking away.

26

27     Several minutes later, defendant was almost struck by a Volkswagen as he tried to
cross Broadway, going toward the club. He put his hands up angrily and yelled at the car.
One person in the car got out; defendant threw a beer can. Two other occupants of the

28  Volkswagen got out and all three punched, kicked, and stomped defendant in the middle

of the street. People on both sides of Broadway were yelling taunts and trying to encourage the fight. Defendant jumped up and ran toward the Broadway tunnel. He did not appear to be injured, did not stumble, and had no trouble running straight. Soon thereafter, an older model brown van drove back down Broadway and turned left onto Columbus, weaving in and out of the bumper-to-bumper traffic.

About 10 to 15 minutes after the Volkswagen incident, prosecution witness Melvin Watson saw defendant pull up to the curb in a brown van. He left the engine running and the lights on, and got out of the van with a car club in his hand. He walked across Broadway to the Roaring 20's side of the street. He looked into the Condor Club, the Marconi Hotel, and then the Roaring 20's, as though looking for someone. Klugman saw defendant in front of the club; it appeared that he was looking for someone. Klugman said, "Anton, there he is." Segal began to walk toward Klugman, but he did not react to her statement. Klugman repeated, "There he is." Segal then walked past defendant and told Klugman to "[c]all Matt to the front." Segal had his back toward defendant.

Defendant raised his hand and struck Segal in the head as Segal passed by. Segal dropped, falling into Elder's arms. Elder, who was leaving the club to smoke, saw defendant strike Segal hard and fast, with what he described as a pipe or a plumber's wrench; he later confirmed that the object defendant used to hit Segal was the same size and color as the car club presented into evidence. Defendant ran away. Several witnesses heard the sound of the car club striking Segal, describing it as a loud pop or sounding like a gunshot, because it was so loud. Watson saw defendant running back toward the van with a car club in his hand. Defendant opened the door of the van and tossed the club in, got into the van, reversed, and sped off down Broadway. The police later recovered the club from defendant's van.

Segal suffered a severe skull fracture. Despite maximal surgical intervention, he was declared brain dead on November 24. The cause of death was craniocerebral trauma. His injuries were consistent with receiving one or two blows.

Defendant's brother Richard testified for the defense. He indicated that he and defendant had been "binge drinking" all day on November 21. He could not recall how much liquor they had consumed. He indicated, "[t]hat night is generally a blur. I mean, I was intoxicated along with my brother; and I have no general recollection of any specific-any specific aspects of the evening." He did remember getting separated from defendant and taking a bus home by himself.

Defendant testified that he had been drinking all day and met Richard at a neighborhood bar that evening and continued to drink. After leaving the bar, they purchased a 12-pack of beer and drank on the street. They went to a Safeway and bought another 12-pack of beer; they then drove to Broadway. Four beers remained. At the Roaring 20's club, Richard touched employee Klugman. Defendant explained that Richard meant nothing and began to walk away. He heard someone say, "Just keep going, get out of here, go down the road." He turned and observed Elder and Clayton and asked what their problem was. Defendant started to walk away again and heard another comment. He returned and stated, "If you got a problem, ..., let's deal with it. Do you have a problem? Do you want to take it around the corner....?" The men exchanged additional words. Segal then appeared and put his hand on defendant's shoulder, walking him backward. Segal told defendant to leave. Defendant pushed Segal's hand aside and told him not to touch him. Segal assumed a stance and took off his watch.

According to defendant, when he stepped off the curb, a Volkswagen swerved in front of him; as defendant walked away, the driver yelled at him. Defendant heard the men in the car yelling and saw them gesturing. He walked up to them and the front passenger

got out of the car and approached defendant. They started fighting and defendant threw a beer he was holding at the passenger. The other men got out of the Volkswagen and began hitting and kicking defendant as he lay on the ground. He was hit on the head with something he believed was metal. The men left and defendant realized they had taken his leather jacket. Since the Volkswagen had left the area, defendant went to look for Richard. At the Roaring 20's club, Klugman screamed, "There he is." This made defendant afraid, as he believed he was in danger. He saw someone coming toward him and perceived it as an attack. Thinking it was a continuation of the previous altercation, he hit the person in one quick motion. Defendant testified that he saw Segal, who "came near me in a quick motion, and I struck him." Defendant then returned to his car and drove away. He admitted having been convicted of robbery in 1988 and throwing coffee at a sheriff's deputy while in jail.

After being arrested on December 4, defendant told police that he did not kill anyone and that he did not recall leaving his engine running or taking the car club with him when he searched for his brother. He admitted hitting Segal on the head with the car club, but maintained that he did not know the identity of the person he hit. He denied hitting Segal from behind, claiming that Segal was on his left. He struck Segal because he believed he was being attacked, but "As it turns out, [Segal] didn't have anything to do with the prior beating and robbery-."

Other witnesses for the defense included Joseph Souza, defendant's cousin. He testified that Richard's previous car accident made him slower. On the evening of November 21, at approximately 9:00 p.m., he saw defendant and Richard walking near Diamond and Chenery Streets. They were involved in a verbal altercation with two other men; Souza walked back to try to diffuse the situation and the people that defendant was arguing with left. Souza felt that defendant and Richard were intoxicated at that time; they both had an odor of alcohol and their eyes were red. A bag of beer was near them on the sidewalk.

Neeshah Azam also testified for the defense. She was in the back seat of a car driving eastbound on Broadway near Columbus. She had been drinking and was "maybe ... a little impaired." She observed the interaction between the individuals in the Volkswagen and a pedestrian. She did not see the pedestrian throw a can and did not see the Volkswagen almost hit him. She testified that it did not appear that the individuals were arguing, but she was not sure what was going on. A passenger from the back seat got out of the car, put on gloves, and picked up a car club. Azam had not mentioned the car club to a defense investigator who interviewed her, nor to the police. Although she testified that she did not see any physical contact between the people, she told the police on the night of the incident that she saw "the man with the can swinging at the guy on the passenger side."

Melissa Harris, another defense witness, testified that she was working at the Roaring 20's club on November 21. She was outside smoking and observed the initial contact between Klugman and defendant and his brother. She did not recall whether they were sober, but indicated that she had earlier said they "could have had a buzz." She told police the night of the incident that the men were probably drunk. After Richard touched Klugman, Harris told the men, "you can't touch the ladies." Defendant said, "[t]hat's my brother, and he doesn't know any better." Defendant then approached the two "white boys," took off his coat, and said something to the effect of "[f]uck you. Would you like to take this around the corner?" Defendant was very angry and was hostile and aggressive. Defendant then left the area with his companion. Harris went back inside the club, as she was afraid of defendant and feared for her safety.

1  Opn. at 1-6.

2          In its opinion, the Court of Appeal noted that this was petitioner's second trial for the

3  murder of Anton Segal.  Opn. at 6.  In his first trial, petitioner was convicted of second degree

4  murder with use of a deadly weapon, and the prior conviction allegations were found true.  Opn. at

5  6.  The Court of Appeal set aside the murder conviction based on issues related to the trial court's

6  dismissal of a juror for misconduct during jury deliberations.  Opn. at 6, citing *People v. Alas* (Cal.

7  Ct. App. No. A092852).  Petitioner was again tried by jury, which likewise convicted him of second

8  degree murder with use of a deadly weapon, and the trial court found the prior convictions true.

9  Opn. at 6-7.

10                              **STANDARD OF REVIEW**

11          A federal court may grant a writ of habeas corpus to a state prisoner only if the state court's

12  rulings "resulted in a decision that was contrary to, or involved an unreasonable application of,

13  clearly established Federal law, as determined by the Supreme Court of the United States" or were

14  "based on an unreasonable determination of the facts in light of the evidence presented" in the state

15  courts.  28 U.S.C. § 2254(d).  Under the "contrary to" clause, a state court's decision is contrary to

16  federal law if it "contradicts the governing law set forth in our cases" or if it "confronts a set of facts

17  that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result

18  different from our precedent."  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  That test does "not

19  require citation of our cases—indeed, it does not even require awareness of our cases, so long as

20  neither the reasoning nor the result of the state-court decision contradicts them."  *Early v. Packer*,

21  537 U.S. 3, 8 (2002) (per curiam).  The ultimate controlling authority is the holding of the Supreme

22  Court's cases at the time of the relevant state-court decision, not the dicta.  *Carey v. Musladin*, ___

23  U.S. ___, 127 S. Ct. 649, 653 (2006).  The state courts are presumed to "know and follow the law,"

24  and the standard for evaluating state-court rulings, which are given the "benefit of the doubt," is

25  "highly deferential."  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam).  In order to warrant

26  habeas relief, the state court's application of clearly established federal law must be not merely

27  erroneous, incorrect, or even "clear error," but "objectively unreasonable."  *Lockyer v. Andrade*, 538

28  U.S. 63, 76 (2003).  It is the habeas petitioner's burden to make that showing.  *Visciotti*, 537 U.S.

1   at 25. Also, state court factual determinations are presumed correct unless rebutted by clear and

2   convincing evidence. 28 U.S.C. § 2254(e)(1).

3           Even if the state court's ruling is contrary to or an unreasonable application of Supreme

4   Court precedent, that error justifies overturning the conviction only if the error had "substantial and

5   injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619,

6   637 (1993). The *Brecht* standard applies to all § 2254 cases, regardless of the type of harmless error

7   review conducted by the state courts. *Fry v. Pliler*, 127 S.Ct. 2321, 2328 (2007).

8                                      **ARGUMENT**

9                                           **I.**

10  **THE TRIAL COURT DID NOT VIOLATE PETITIONER'S RIGHT TO
    PRESENT A DEFENSE OR RIGHT TO A FAIR TRIAL BY**

11  **PRECLUDING HIM FROM INTRODUCING TESTIMONY OF AN
    EXPERT WITNESS FROM PETITIONER'S PRIOR TRIAL WHERE**

12  **A FOUNDATION HAD NOT BEEN LAID**

13          Petitioner claims the trial court violated his right to present a defense and his right to a fair

14  trial by precluding the defense from reading into the record the testimony of an expert witness who

15  had testified at petitioner's first trial. Pet'n at 8-10. He urges that by preventing the defense from

16  introducing Dr. Baselt's former testimony, the court "deprived petitioner of critical corroborative

17  evidence on the intoxication defense." Pet'n at 10. Petitioner urges the evidence presented was

18  "sufficient to justify admission of Baselt's prior testimony." Pet'n at 10. The California Court of

19  Appeal rejected petitioner's argument, finding that petitioner failed to lay an adequate foundation

20  for the former testimony, and that "the trial court properly exercised its discretion not to admit Dr.

21  Baselt's former testimony." Opn at 10. The state court's decision was not an unreasonable

22  application of United States Supreme Court holdings.

23          California Evidence Code section 1291(b) provides that the admission of the prior sworn

24  testimony of an unavailable witness is subject to the same limitations and objections as though the

25  witness was testifying live at trial. Before admitting expert testimony, a trial court has an obligation

26  "to require adequate foundation for the [expert's] opinion." *Korsak v. Atlas Hotels, Inc.*, 2

27  Cal.App.4th 1516, 1523 (1992); Cal. Evid. Code § 803. Where there is no factual basis for the

28  expert's opinion, the opinion must be excluded. See Cal. Evid. Code § 803. Thus, as the California

Memorandum of Points and Authorities in Support of Answer, *Daniel Alas v. William Sullivan, et al.*, C 07-3811 SI

6

1    Court of Appeal stated, "the assumptions upon which hypothetical questions posed to an expert are

2    based must be supported by evidence in the record."  Opn. at 8 (citing *People v. Hayes*, 172

3    Cal.App.3d 517, 522 (1985)).

4         As the Court of Appeal stated:

5         The evidence in the record at the first trial supported the hypothetical questions posed
          to Dr. Baselt – defendant detailed how many beers he drank and at what time those beers
6         were consumed on November 21.  Based upon that evidence, Dr. Baselt prepared a chart
          showing the level of defendant's alcohol consumption and his level of intoxication.  He
7         opined that defendant had a blood alcohol level of .25 percent at the time of the homicide,
          based on a set of assumptions regarding what specific alcohol defendant consumed at
8         specific times on November 21.
               . . .
9         At defendant's second trial, the defense did not lay an adequate foundation for
          admission of the vast majority of Dr. Baselt's prior testimony.  As defendant here
10        concedes, "all the hypothetical facts forming the basis for Baselt's prior testimony were
          not presented to the jury in this case" . . . .

11

12   Opn. at 9.  Thus, under California law, petitioner had not met the foundational requirements for

13   admission of former testimony.  California's requirement for an adequate foundation did not violate

14   petitioner's Constitutional rights.  "A defendant's right to present relevant evidence is not unlimited,

15   but rather is subject to reliable restrictions."  *United States v. Scheffer*, 523 U.S. 302, 308 (1987);

16   *see Rock v. Arkansas*, 483 U.S. 44, 55 (1987) ("numerous state procedural and evidentiary rules

17   control the presentation of evidence and do not violate the defendant's right to testify").  Rules

18   governing admission of evidence do not abridge a defendant's right to present a defense "so long as

19   they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'"  *Scheffer*,

20   523 U.S. at 308.  Accordingly, the trial court did not violate petitioner's Constitutional rights by

21   excluding Baselt's former testimony.  *See Scheffer*, 523 U.S. at 308 ("state and federal rulemakers

22   have broad latitude under the Constitution to establish rules excluding evidence from criminal

23   trials").

24        In challenging the exclusion the former testimony, petitioner urges that he laid an adequate

25   foundation.  Pet'n at 10.  In essence, he argues the trial court erred under California law in finding

26   an adequate foundation had not been laid.  See Pet'n at 10.  However, "'federal habeas corpus relief

27   does not lie for errors of state law.'"  *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (quoting *Lewis v.

28   Jeffers*, 497 U.S. 764, 780 (1990)).  "We have found the exclusion of evidence to be unreasonably

1    arbitrary and disproportionate only where it has infringed upon a weighty interest of the accused."

2    *Scheffer,* 523 U.S. at 308.  Federal are bound by the state court's finding of fact and application of

3    its own law. *See Lewis,* 497 U.S. at 780 (stating federal court may not "peer majestically over the

4    [state] court's shoulder in order to second-guess it interpretation of the facts that quite reasonably --

5    perhaps even quite plainly -- fit with the statutory language"). In short, petitioner may not dispute

6    the state's interpretation of its own laws. *See Clemons v. Mississippi,* 494 U.S. 738, 747 (1990).

7        Petitioner additionally argues that the state court's ruling deprived him of his right to a fair

8    trial and right to present a defense. He claims "disallowing the evidence effectively removed the

9    defense of voluntary intoxication." Pet'n at 11. As the state court held, it did not. In rejecting

10    petitioner's claim that the trial court's ruling violated his right to a fair trial and right to present a

11    defense, the Court of Appeal stated:

12        The trial court in no way prevented defendant from presenting expert testimony –
defendant could have called any other expert in the field to testify. The trial court merely
13        exercised its discretion not to admit expert testimony for which an insufficient foundation
had been laid.

14

15    Opn at 10, n.9. Thus, the challenged ruling did not prevent petitioner from presenting expert

16    testimony in support of his intoxication defense. Rather, it simply precluded the defense from

17    reading into the record Dr. Baselt's testimony from petitioner's first trial because the defense had

18    failed to lay an adequate foundation. This did not constitute a violation of petitioner's right to a fair

19    trial or right to present a defense. *See Taylor v. Illinois,* 484 U.S. 400, 410-11 (1998) (defendant

20    does not have an absolute right to present evidence; he must comply with established rules of

21    evidence and procedure); *Montana v. Egelhoff,* 518 U.S. 37, 42 (1996) (defendant does not have an

22    unfettered right to present evidence that is inadmissible under the standard rules of evidence).[1]

23        As shown, the state court excluded Baselt's former testimony based on the defense's

24    failure to lay an adequate foundation as required by California's evidentiary rules. As the state court

25

26        1. Petitioner cites *Chambers v. Mississippi,* 410 U.S. 284, 294 (1973) in support of his claim

27    he was deprived the right to present a defense. Pet'n at 10. *Chambers* "does not stand for the
proposition that a defendant must be allowed to put on any evidence he chooses." *LeGrand v.*

28    *Stewart,* 133 F.3d 1253, 1267 (9th cir. 1998).

1   observed, this did not preclude petitioner from presenting a live expert at that second trial who could

2   testify based on hypotheticals that had been established by the facts.  The state court's ruling that

3   petitioner was not denied his right to a fair trial or his right to present a defense was not an

4   unreasonable application of Supreme Court holdings.  Accordingly, the claim fails.  28 U.S.C. §

5   2254(d).

6                                                    II.

7        **PETITIONER HAS FAILED TO SHOW TRIAL COUNSEL WAS**
         **INEFFECTIVE IN FAILING TO REQUEST THAT A REDACTED**
8        **VERSION OF BASELT'S TESTIMONY BE ADMITTED OR TO**
         **SECURE AN ALTERNATE EXPERT TO TESTIFY**
9

10       Petitioner claims he was denied effective assistance of counsel when his trial counsel failed

11  to either request that a redacted version of Dr. Baselt's former testimony be admitted, lay a proper

12  foundation for the testimony, or secure another expert to testify at petitioner's second trial.  Pet'n at

13  11-12.  He urges that an expert on intoxication was an important witness and asserts that "counsel

14  could have had no tactical purpose for taking any or all of these steps to ensure testimony on

15  voluntary intoxication was heard by the jury."  Pet'n at 12.  Petitioner has failed to show trial counsel

16  had no reasonable tactical basis for not taking the suggested action or that he was prejudiced by any

17  alleged shortcoming.  Thus, the state court's rejection of petitioner's claim of ineffective assistance

18  of counsel was not an unreasonable application of clearly established United States Supreme Court

19  law.  28 U.S.C. § 2254(d).

20       In order to establish that counsel was ineffective, petitioner bears the burden of showing

21  that counsel's performance fell below an objective standard of reasonableness, and that there is a

22  reasonable probability the result of the proceeding would have been different.  *Strickland v.*

23  *Washington*, 466 U.S. 668, 687-688 (1984).  The court must judge the reasonableness of counsel's

24  actions not in hindsight, but as of the time of counsel's conduct.  *Id.* at 690.

25       Further, for petitioner to succeed he must show that the state court applied *Strickland* to

26  the facts of his case in an objectively unreasonable manner.  *Bell v. Cone,* 535 U.S. 685, 698-699

27  (2002).  Thus, federal habeas review of a claim of ineffective assistance is "doubly deferential."

28  *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) (per curiam).

1    Here, the state court's ruling was not unreasonable. As the state court found, petitioner's

2  claim failed for a lack of showing deficient performance and a lack of showing prejudice.  The state

3  court correctly observed:

4    The reasonableness of trial counsel's performance is evaluated from counsel's
   perspective at the time of his or her actions, in light of all the circumstances; the standard

5   of review is highly deferential.  We do not engage in judicial hindsight.  (*Strickland v.
   Washington, supra*, 466 U.S. at pp. 687-694.)  We will reverse for ineffective assistance

6   of counsel only if "'the record on appeal affirmatively discloses that counsel had no
   rational tactical purpose for his act or omission.'"  (*People v. Zapien* (1993) 4 Cal.4th 929,

7   980.)  A record which is silent as to why counsel acted or failed to act in the manner
   challenged will not suffice, "'"unless there simply could be no satisfactory explanation"'"

8   for counsel's conduct.  (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.)

9  Opn. at 11.

10    With those principles in mind, the Court of Appeal reviewed the record and concluded

11  petitioner had failed to show that counsel's performance was deficient:

12    Here, we have nothing in the record that indicates why trial counsel elected not to
   secure another expert witness regarding the effects of alcohol, once Dr. Baselt's former

13   testimony was ruled inadmissible.  As respondent notes, defense counsel could well have
   decided that since the defense presented through Dr. Baselt was not successful in the first

14   trial, it was not advisable tactically to locate another expert to try it again.  As to the
   hypothetical portion of Baselt's testimony, perhaps in weighing the effect of introducing

15   foundational evidence relating to defendant's violence toward his girlfriend the day before
   the homicide, defendant's anger management issues, and his long alcohol and drug abuse

16   problems, against the potential impact of an expert's testimony, defense counsel made the
   tactical choice not to call an expert.  While counsel renewed his motion to introduce the

17   former testimony prior to the close of the defense case, as noted in defendant's reply brief,
   that does not negate the possibility that such a tactical choice was made.  Counsel could

18   have renewed the motion to introduce the former testimony of Baselt to further preserve
   the issue for appeal.  Counsel could well have decided that, given the state of the evidence

19   in the second trial, [] he was better off not pursuing the expert testimony.  For all we
   know, defense counsel could have had another expert in the wings, ready to testify, if he

20   decided that was the best tactical course of action, but he simply decided upon reflection
   that it was not.  As to counsel's failure to ask the court to redact those portions of Baselt's

21   prior testimony not supported by the record in the current case, and admit the remainder,
   as indicated earlier that would have resulted in very little of his former testimony going

22   to the jury.  His chart calculating defendant's blood alcohol content at the time of the
   homicide was based upon very specific facts in the record of the first trial about what

23   alcohol defendant consumed at what particular time that day, plus other facts not
   established in the second trial.  Many other areas gone into with Dr. Baselt in the first trial

24   were then based upon the assumption that someone had a .25 percent blood alcohol
   content.  Counsel may well have decided that redaction simply was not a viable course of

25   action.  Thus, as to each of defendant's claimed areas of ineffective representation, a
   sound tactical choice could support trial counsel's decision.[FN12.]

26

27    [FN12.]  Defendant argues in his reply brief that, "there is absolutely nothing
   supporting the theory that defense counsel decided for tactical reasons not to secure expert
   testimony on appellant's intoxication on November 21."  The burden, of course, is on

28   defendant to demonstrate that the decision was not the result of a sound tactical choice.

1    (*People v. Zapien, supra*, 4 Cal.4th 29 at p. 980.)

2    Opn. at 11-12.

3    The state court's rejection of petitioner's claim was not unreasonable. As the state court

4    found, there was no showing that trial counsel did not have a tactical reason for not taking the action

5    petitioner urges was required of counsel. Petitioner did not raise this issue in collateral review,

6    wherein he could have provided evidence to counter the presumption that counsel had reasonable

7    basis for his decisions. As petitioner made no attempt to develop such facts in state court, he may

8    not attempt to do so now. *See* 28 U.S.C. § 2254(e)(2).

9    To the extent that petitioner argues that absence of expert testimony negatively affected

10    his credibility, the Court of Appeal aptly observed:

11    We have no idea, for example, whether defendant simply could not remember the
     details of his drinking on November 21, by the time of the second trial. Trial counsel could

12    have made a sound tactical decision, if defendant was having difficulty remembering these
     facts, not to set him up to be impeached by his prior testimony in that regard. Defense

13    counsel may not have been able to lay a sufficient foundation to have an expert testify
     what blood alcohol level defendant had at the time of the incident. In that situation,

14    deciding to rely upon his client's testimony regarding how he felt that evening might have
     been the sounder tactical choice, rather than asking for a redacted portion of Baselt's

15    testimony to be admitted.

16    Opn. at 12, n.11.

17    In light of this record, petitioner failed to show that trial counsel rendered deficient

18    performance. The state court's rejection of his ineffective assistance of counsel claim was not an

19    unreasonable application of clearly established United States Supreme Court law.

20    Moreover, even if petitioner had shown trial counsel rendered deficient performance, as

21    the state court found, his claim of ineffective assistance of counsel fails because he has not

22    demonstrated prejudice. The state court's decision was not an unreasonable application of United

23    States Supreme Court holdings. In petitioner's first trial, his counsel presented the expert testimony

24    of Dr. Baselt. Petitioner claims the omission of it from his second trial prejudiced him. Pet'n at 12-

25    13. However, the first trial, in which Dr. Baselt testified, resulted in the same verdict: petitioner was

26    guilty of second degree murder. As the Court of Appeal found:

27    defendant has failed to show how expert testimony, from either Dr. Baselt or another
     expert, would have resulted in a more favorable result. First and foremost, the defense he

28    complains of counsel not presenting in the second trial was presented, unsuccessfully, in

1    the first. Defendant has not demonstrated why or how presenting the same defense in the
2    second trial would have obtained a better result.

3    Opn. at 13. Furthermore, as the state court found, the evidence that petitioner was guilty of murder

4    was overwhelming:

5    > there was overwhelming evidence to support the verdict of second degree murder,
>    including several witnesses who observed defendant parking his van, leaving the engine
6    > running and the lights on, taking a car club with him, crossing the street, walking through
>    a crowd of people standing in front of the club, picking victim Segal out of the crowd
7    > (coincidentally the person with whom he was involved in an earlier confrontation), and
>    striking a blow to Segal's head with enough force to kill him. This evidence, also
8    > presented at the first trial, tended to negate the intoxication defense presented the first time
>    around. We fail to see how there is a reasonable probability the result would have been
9    > different if the expert had testified during the second trial.

10   Opn. at 13.

11          The record supports the state court's finding. The state court's determination was neither

12   an unreasonable determination of the facts nor an unreasonable application of *Strickland*.

13   Accordingly, petitioner's claim of ineffective assistance of counsel fails. 28 U.S.C. § 2254(d).

14                                              **III.**

15          **PETITIONER IS PROCEDURALLY BARRED FROM RAISING HIS
            THIRD CLAIM; MOREOVER, THE TRIAL COURT'S ISOLATED**
16          **REMARK TO DEFENSE COUNSEL DID NOT VIOLATE
            PETITIONER'S RIGHT TO A FAIR TRIAL**
17

18          Petitioner claims that he was denied his right to a fair trial when the trial court admonished

19   his trial counsel during his cross-examination of a prosecution witness. Pet'n at 13. Not so. First,

20   petitioner is procedurally barred from raising this claim and may not seek federal habeas relief on

21   this basis. As the state appellate court found, petitioner forfeited this claim by failing to object in

22   the trial court. Opn. at 14. Second, the claim is without merit. The state court's rejection of

23   petitioner's claim was not an unreasonable application of United States Supreme Court holdings.

24          The comment about which petitioner complains occurred at the end of defense counsel's

25   cross-examination of prosecution witness Melvin Watson:

26   > After both sides had indicated they had completed their questions, defense counsel
>    stated, "Just one more thing. I apologize." The court replied, "Counsel, I've warned you
27   > before. You are running the show here, not the defendant. You are the only person here
>    of the two of you licensed to practice law, as far as I know. But go ahead."[FN13.] Defense
28   > counsel then asked another question of the witness. Defense counsel did not object to the

1    comment that was made by the trial court, nor was any admonition requested.

2    [FN13.] The comment was apparently in reference to prior conduct by the defendant
during trial.

3

4  Opn. at 14.

5        As the state appellate court ruled, petitioner forfeited his challenge to the trial court's

6  comment by failing to object or request an admonition in the trial court.  Opn. at 14 (citing *People*

7  *v. Cash*, 28 Cal.4th 703, 730 (2002), and *People v. Fudge*, 7 Cal.4th 1075, 1107-08 (1994)

8  (defendant who claimed the trial court had repeatedly disparaged defense attorneys and treated them

9  in a condescending manner had waived the issue by failing to object or request an admonition)).

10  Thus, under California law, petitioner forfeited his claim.  *See Fudge*, 7 Cal.4th at 1107-08.  He

11  therefore is procedurally barred from presenting this claim.   The Ninth Circuit has expressly

12  acknowledged that California's "contemporaneous objection" requirement is an adequate and

13  independent state bar.  *Melendez v. Warden*, 288 F.3d 1120, 1125 (9th Cir. 2002)("We held more

14  than twenty years ago that the rule is consistently applied when a party has failed to make any

15  objection to the admission of evidence."); *see Paulino v. Castro*, 371 F.3d 1083, 1093 (9th Cir.

16  2004); *Bonin v. Calderon*, 59 F.3d 815, 842-43 (9th Cir.1995); *Richardson v. Newland*, 342 F. Supp.

17  2d 900, 930 (E.D. Cal. 2004).

18        In his petition to this Court, petitioner cites no authority in support of his claim that the

19  trial court's comment violated his right to a fair trial.  Petitioner cites only *Strickland* in support of

20  his claim that the trial court's comment violated his right to counsel. Pet'n at 13-14.  *Strickland* is

21  inapposite.  Petitioner has cited no United States Supreme Court holding in support of is claim.[2]

22        "It is well established that a trial judge is more than a moderator or umpire." *United States*

23  *v. Mostella*, 802 F.2d 358, 361 (9th  Cir. 1986).  In the context of federal habeas corpus review, a

24  federal court will reverse a state court conviction only where "the state trial judge's behavior

25  rendered the trial so fundamentally unfair as to violate federal due process under the United States

26

27      2.  If there is no holding from the United States Supreme addressing the issue raised by a
habeas petitioner, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established

28  Federal law.' § 2254(d)(1)."  *See Carey*, 127 S.Ct. at 654.

Memorandum of Points and Authorities in Support of Answer, *Daniel Alas v. William Sullivan, et al.*, C 07-3811 SI

1 | Constitution." *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir.1995).

2 |     Because federal courts "have no supervisory power over criminal proceedings in state

3 | courts[, t]he only standards [a federal court] can impose on the states are those dictated by the

4 | Constitution." *Duckett*, 67 F.3d at 740-41. The comment about which petitioner complains did not

5 | violate his rights. *See Gayle v. Scully*, 779 F.2d 802, 807 (2d. Cir. 1985) (trial judge's caustic,

6 | sarcastic comments and offensive conduct, although perhaps inconsistent with institutional standards

7 | of federal courts, did not violate due process); *Maurino v. Johnson*, 210 F.3d 638, 645-46 (6th Cir.

8 | 2000) (hostility between judge and counsel did not deprive defendant of due process).

9 |     In *United States v. Liteky,* 510 U.S. 540, 555-556 (1994), the Court held:

> judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They may do so if they reveal an opinion that derives from an extrajudicial source; and they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. . . . Not establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration-even a stern and short-tempered judge's ordinary efforts at courtroom administration-remain immune.

16 |     Here, the state court found that the trial court judge's comment did not violate petitioner's

17 | right to a fair trial. *See Villafuerte v. Stewart,* 111 F.3d 616, 632 (9th Cir. 1997) (holding state court

18 | finding of absence of bias is presumed correct). Specifically, the state court found:

> defendant has not demonstrated that this one isolated comment disparaged defense counsel to the degree that it denied him the right to a fair trial, as opposed to being a fair comment intended to control the proceedings. Defendant has cited to us no case where such a relatively innocuous comment by a trial judge, in isolation, was found to constitute misconduct and require reversal because it denied defendant a fair trial. We decline to do so here.

23 | Opn. at 14-15. This ruling was not an unreasonable application of United States Supreme Court

24 | holdings. *See Liteky*, 510 U.S. at 556. Accordingly, petitioner's claim fails. 28 U.S.C. § 2244(d).[3/]

---

    3. Petitioner cites the sentencing hearing comments of victim Anton Segal's father, James, to support his claim that the trial court's comment violated his fair trial rights. Pet'n at 13-14. However, how the comment resonated with the family of the victim was irrelevant to whether petitioner was deprived of a fair trial before the jury. The jury was comprised of twelve disinterested persons who had no relationship or history with victim Anton Segal or with petitioner. Moreover,

1                                           **IV.**

2      **THE TRIAL COURT DID NOT VIOLATE HIS DUE PROCESS RIGHTS IN RESPONDING TO THE JURY'S REQUEST FOR A DEFINITION**

3      **DURING DELIBERATIONS**

4           Petitioner claims that he was denied his right to due process when the trial court responded

5 to the jury's question during deliberations. Pet'n at 14. He urges that the trial court violated his due

6 process right in directing the jury to re-read CALJIC Nos. 8.11 and 8.31, but not also CALJIC No.

7 8.40. Pet'n at 14-15. He additionally argues the trial court erroneously neglected to have the jury

8 also re-read CALJIC Nos. 8.50, 8.72, and 8.75. Pet'n at 15-16. First, petitioner is procedurally

9 barred from raising a claim based on the trial court's failure to direct the jury to re-read CALJIC Nos.

10 8.50, 8.72,and 8.75, and he may not seek federal habeas relief on this basis. As the state appellate

11 court found, petitioner forfeited this claim by failing to object in the trial court. Second, the claim

12 is without merit. The state court's rejection of petitioner's claim was not an unreasonable

13 application of clearly established United States Supreme Court law.

14           The Court of Appeal explained the issue as follows:

15           During deliberations, the jury sent a note that stated the following: "A juror would like the definition of 'intentional act' as it applies to this trial versus 'intent to kill,'

16 clarified. [¶] Specifically, in implied malice, does the intention pertain to the act of striking the victim, or must it also include the intention that the blow would be fatal?" In

17 response, the court instructed the jury to reread CALJIC Nos. 8.11 (definition of malice, both express and implied) and 8.31 (definition of second degree implied malice murder).

18 Defense counsel requested that the court also instruct the jury to reread CALJIC No. 8.40 (definition of voluntary manslaughter).[FN14.] The trial court declined to do so. The jury

19 returned with a verdict shortly thereafter.

20           [FN14.] As defendant did not request them below, his claim of error for not instructing the jury to reread additional instructions (such as CALJIC Nos. 8.45 (definition

21 of involuntary manslaughter), 8.50 (distinction between murder and manslaughter), 8.72 (reasonable doubt must be resolved in favor of lesser offense), 8.74 (jury unanimity) and

22 8.75 (order of deliberations)) is waived on appeal. (*Schouten v. Crawford* (1953) 118 Cal.App.2d 59, 62-63; *People v. Kageler* (1973) 32 Cal.App.3d 738, 745-746; see also

23 *People v. McCleod* (1997) 55 Cal.App.4th 1205, 1220 [failure to request reread waives claim on appeal].) In any event, the court had already instructed on general principles of

24 law and was responding to a specific request by the jury for clarification of "intentional

25

26 unlike James Segal, the jury was unaware that petitioner had been already convicted of second degree murder and that this was his second trial, the first conviction having been reversed following

27 the removal of a juror for misconduct during deliberations. As the state court held, the trial court's isolated comment in a record spanning more than 500 pages was a "fair imment intended to control

28 the proceedings" and did not rise to the level of distraction petitioner urges.

1    act" as used in the implied malice definition of second degree murder. The trial court was
2    not required to instruct the jury sua sponte to reread general principles of law, nor every
     instruction that mentioned the words "intentional act," nor those that distinguished
3    between murder and manslaughter.

4    Opn. at 15.  Under California law:

5         "Where the original instructions are themselves full and complete, the court has
     discretion under [Penal Code §] 1138 to determine what additional explanations are
6    sufficient to satisfy the jury's request for information. [Citation.]" (*People v. Solis* (2001)
     90 Cal.App.4th 1002, 1015.)  We assume that the jury considers the instructions given
7    prior to deliberations in conjunction with those given during deliberations. See *People v.
     Kraft* (2000) 23 Cal.4th 978, 1077.)
8

9    Opn. at 15-16.  The court of appeal explained the scope of the jury's question and the correctness

10   of the trial court's answer:

11        In the present case, the jury asked a very specific question about the definition of
     "intentional act" during deliberations, i.e., "Specifically, in implied malice, does the
12   intention pertain to the act of striking the victim, or must it also include the intention that
     the blow would be fatal?" This question was adequately and fully addressed in the
13   instructions that the court instructed the jury to reread. CALJIC No. 8.11 told the jury that,
     "[w]hen it is shown that a killing resulted from the intentional doing of an act with express
14   or implied malice, no other mental state need be shown to establish the mental state of
     malice aforethought." CALJIC No. 8.30 told the jury that murder in the second degree
15   under an implied malice theory includes the following elements: an intentional act
     resulting in a killing; the natural consequences of that act are dangerous to human life; and
16   the act was deliberately performed. This instruction further informed the jury that "[w]hen
     the killing is the direct result of such an act, it is not necessary to prove that the defendant
17   intended that the act would result in the death of a human being." The court also told the
     jury that they should advise the court if they had any further questions; they did not do so.
18   These two instructions fully answered the very specific question posed by the jurors and
     no further elaboration with the one additional instruction requested by defendant below,
19   CALJIC No. 8.40 (defining voluntary manslaughter as the unlawful killing of a human
     being with the intent to kill), was necessary. The jury's question related only to the
20   definition of intentional act for implied malice second degree murder; it did not ask
     anything about manslaughter. The jury expressed no confusion regarding the distinction
21   between murder and manslaughter. CALJIC No. 8.40, as well as the several other
     instructions the defendant now cites on appeal, were extraneous to the question asked by
22   the deliberating jurors. No error appears from the court's failure to instruct the jury to
     reread any instructions other than those it admonished the jury to reconsider.
23

24   Opn. at 16.

25        As the state court found,  the question posed by the jury was fully addressed by CALJIC

26   Nos. 8.11 and 8.31, to which the trial court directed the jury.  Given that the jury did not ask about

27   manslaughter and expressed no confusion about the distinction between murder and manslaughter,

28   the trial court correctly concluded CALJIC No. 8.40 (as well as Nos. 8.50, 8.72, and 8.75) were

1   "extraneous to the question asked by the deliberating jurors." Having responded with sufficient

2   specificity to clarify the jury's problem, the trial court did not violate petitioner's due process rights

3   by directing the jury to those two instructions. See *United States v. Span*, 170 F.3d 798, 802 (7th

4   Cir. 1999) (where original instructions clearly and plainly state law, court may answer jury question

5   by referring to jury instructions).

6        We held in *Brecht* that a federal court may grant habeas relief based on trial error only
       when that error "'had substantial and injurious effect or influence in determining the jury's
7        verdict.'" 507 U.S., at 637, 113 S.Ct. 1710 (quoting *Kotteakos v. United States*, 328 U.S.
       750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). This standard reflects the "presumption
8        of finality and legality" that attaches to a conviction at the conclusion of direct review. 507
       U.S., at 633, 113 S.Ct. 1710. It protects the State's sovereign interest in punishing
9        offenders and its "good-faith attempts to honor constitutional rights," id., at 635, 113 S.Ct.
       1710, while ensuring that the extraordinary remedy of habeas corpus is available to those
10      " 'whom society has grievously wronged,' " id., at 634, 113 S.Ct. 1710 (quoting *Fay v.
       Noia,* 372 U.S. 391, 440-441, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963)).

11

12   *Calderon v. Coleman,* 525 U.S. 141, 145-46 (1998) (per curiam).

13        Petitioner cites *McDowell v. Calderon*, 130 F.3d 833 (9th cir. 1997) in support of his

14   claim. Pet'n at 15.[4/] *McDowell* does not aid his cause. First, *McDowell* is distinguishable, as in that

15   case the jury's note demonstrated that 11 of 12 jurors did not believe they could consider mitigating

16   factors in the penalty phased of a capital case when, under the law, they were required to consider

17   them. Second, as the Ninth Circuit more recently stated, *McDowell* is no longer good law:

18        In *Weeks v. Angelone*, 528 U.S. 225, 120 S.Ct. 727, 732-33, 145 L.Ed.2d 727 (2000),
       the Supreme Court reached the opposite conclusion on essentially the same facts (during
19        penalty-phase deliberations, jurors informed the trial court that they were confused by a
       correctly typed and constitutionally adequate instruction, and the judge directed them only
20        to look at the text of the instruction). *Weeks* appears to overrule *McDowell. See also
       Coleman v. Calderon*, 210 F.3d 1047, 1049 n. 1 (9th Cir.2000) (acknowledging that
21        *McDowell* implicitly was overruled on another issue by the Supreme Court's decision in
       *Calderon v. Coleman*, 525 U.S. 141, 146, 119 S.Ct. 500, 142 L.Ed.2d 521 (1998)).

22

  *Morris v. Woodford*, 273 F.3d 826, 839 n.4 (9th Cir. 2001).

23

24        In *Weeks*, the United States Supreme Court held that the Constitution is not violated when

---

25        4. Petitioner also cites *United States v. Miller*, 546 F.2d 320, 324 (9th Cir. 1976), in support
26   of is claim. Pet'n at 15. However, *Miller* was neither a United States Supreme Court case nor a
  federal habeas case and was limited to the facts before it. As *Miller* stated, "we are not suggesting
27   that in every case where the trial judge fails or refuses to give complete reinstruction, there is
  reversible error. We base this decision solely on the facts and evidence in this particular case." 546
28   F.2d. at 324.

1  a judge directs the jury's attention to specific parts of a valid instruction. *Weeks,* 528 U.S. at 234.

2  Moreover, the jury is presumed to understand the judge's answer. *Id.* at 234.

3        Here, after receiving the jury's question asking for clarification of "intent to kill" as it

4  related to "implied malice," the trial court directed the jury to CALJIC Nos. 8.11 and 8.31, i.e., the

5  two jury instructions that specifically addressed intent to kill as it related to implied malice. The

6  state court's ruling was not an unreasonable application of United States Supreme Court holdings.

7  *See Weeks,* 528 U.S. at 234. Accordingly, petitioner's claim fails.

8  **CONCLUSION**

9        Accordingly, respondent respectfully requests that the petitioner for writ of habeas corpus

10  be denied with prejudice.

12      Dated: January 14, 2008

13                       Respectfully submitted,

14                       EDMUND G. BROWN JR.
                     Attorney General of the State of California

15                       DANE R. GILLETTE
16                       Chief Assistant Attorney General

17                       GERALD A. ENGLER
                     Senior Assistant Attorney General

18                       GREGORY A. OTT
                     Deputy Attorney General

19                       /S/

21                       LINDA M. MURPHY
                     Deputy Attorney General

22                       Attorneys for Respondent

23  40205923.wpd
    SF2007402034

24

25

26

27

28

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:    *Alas v. Sullivan*

No.:    **C 07-3811 SI**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made.  I am 18 years of age or older and not a party to this matter.  I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service.  In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On January 14, 2008, I served the attached **(1) ANSWER TO THE ORDER TO SHOW CAUSE; (2) MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER; (3) NOTICE OF LODGING OF; AND INDEX TO, EXHIBITS** by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA  94102-7004, addressed as follows:

**Hilda Ellen Scheib**
**Attorney at law**
**P.O. Box 29098**
**San Francisco, CA 94129**

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on January 14, 2008, at San Francisco, California.

| Susan Chiang | | |
| --- | --- | --- |
| Declarant | | Signature |

40205820.wpd