**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL ALAS, | No. C 07-3811 SI |
| Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| WILLIAM SULLIVAN, | |
| Respondent. | |

On May 24, 2004, a jury convicted petitioner Daniel Alas of second degree murder (Cal. Penal Code § 187) and of personally using a deadly or dangerous weapon in the commission of a felony (Cal. Penal Code § 12022(b)(1)). At subsequent sentencing proceedings, the state court found that petitioner had previously been convicted of first degree robbery (Cal. Penal Code §§ 211, 212.5(b)). After calculating petitioner's minimum sentence and enhancing it based on the fact of his prior conviction, the court imposed a sentence of 36 years to life.

Petitioner has now filed a writ for habeas corpus pursuant to 28 U.S.C. § 2254. He challenges his conviction and sentence on four grounds: (1) the trial court's exclusion of expert testimony regarding petitioner's voluntary intoxication defense deprived petitioner of his constitutional rights; (2) defense counsel's decision not to introduce admissible expert testimony regarding petitioner's voluntary intoxication defense amounted to ineffective assistance of counsel; (3) the trial court made a remark to defense counsel that demonstrated lack of impartiality and influenced the jury; and (4) petitioner was denied his due process rights when, after a jury inquiry regarding implied malice, the trial court denied

defense counsel's request to instruct the jury to read the instruction on voluntary manslaughter.[1] After carefully reviewing the parties' briefs and the record, the Court hereby DENIES the petition for the reasons discussed below.

## BACKGROUND

The California Court of Appeal summarized the facts of this case as follows:

> . . . On November 21, 1998,[2] defendant and his brother Richard were outside the Roaring 20's strip club on Broadway in San Francisco. . . . [When] defendant was stopped by an employee after defendant tried to enter the club without paying and with beer in his hand. . . [a] confrontation ensued between defendant and [two young customers, Brian] Elder and [Rick] Clayton. . . . Defendant was very angry and according to Clayton, "the only thing he was looking for, was a fight."
>
> [A club employee] . . . told the disc jockey to get the manager. Anton Segal (the greeter/doorman/bouncer at the club) came out and saw the developing situation. He put his hand on defendant's shoulder and tried to take care of the situation calmly. He told defendant to leave and to return when he was sober. Defendant brushed off Segal's hand and grew angrier and violent. . . . Segal removed his watch, as if to defend himself, and defendant walked away, shouting. . . .
>
> Elder and Clayton both smelled alcohol on defendant's breath. Elder noticed that defendant was beginning to slur his words, but neither had any difficulty understanding defendant. Defendant appeared drunk and his gait was unsteady, but his motor skills otherwise appeared unimpaired. He had no difficulty walking away.
>
> Several minutes later, defendant was almost struck by a Volkswagen. . . . He put his hands up angrily and yelled at the car. One person in the car got out; defendant threw a beer can. Two other occupants of the Volkswagen got out and all three punched, kicked, and stomped defendant in the middle of the street. . . . Defendant jumped up and ran toward the Broadway tunnel. He did not appear to be injured, did not stumble, and had no trouble running straight. . . .
>
> About 10 to 15 minutes after the Volkswagen incident, prosecution witness Melvin Watson saw defendant pull up to the curb in a brown van. He left the engine running and the lights on, and got out of the van with a car club in his hand. He walked across Broadway to the Roaring 20's side of the street. He looked . . . as though [he was] looking for someone. [A co-worker warned Segal], "Anton, there he is." Segal . . . then walked past defendant and . . . had his back toward defendant.
>
> Defendant raised his hand and struck Segal in the head as Segal passed by. Segal dropped, falling into Elder's arms. Elder . . . saw defendant strike Segal hard and fast,

---

[1] It is unclear whether petitioner maintains this fourth and final claim, which was included in the initial habeas petition, but omitted from the traverse. Regardless, the Court will address all four grounds upon which petitioner initially requested relief.

[2] All further references are to calendar year 1998, unless otherwise indicated.

2

with what he described as a pipe or a plumber's wrench; he later confirmed that the object defendant used to hit Segal was the same size and color as the car club presented into evidence. Defendant ran away. Several witnesses heard the sound of the car club striking Segal, describing it as a loud pop or sounding like a gunshot, because it was so loud. Watson saw defendant running back toward the van with a car club in his hand. Defendant opened the door of the van and tossed the club in, got into the van, reversed, and sped off down Broadway. The police later recovered the club from defendant's van.

Segal suffered a severe skull fracture. Despite maximal surgical intervention, he was declared brain dead on November 24. The cause of death was craniocerebral trauma. His injuries were consistent with receiving one or two blows.

Defendant's brother Richard testified for the defense. He indicated that he and defendant had been "binge drinking" all day on November 21. He could not recall how much liquor they had consumed. . . .

Defendant testified that he had been drinking all day and . . . evening. At the Roaring 20's club, [after the confrontation with Elder and Clayton], Segal then appeared and put his hand on defendant's shoulder, walking him backward. Segal told defendant to leave. Defendant pushed Segal's hand aside and told him not to touch him. Segal assumed a stance and took off his watch.

[Following the altercation with the occupants of the Volkswagen], . . . [a]t the Roaring 20's club, [a club employee] screamed, "There he is." This made defendant afraid, as he believed he was in danger. He saw someone coming toward him and perceived it as an attack. Thinking it was a continuation of the previous altercation, he hit the person in one quick motion. Defendant testified that he saw Segal, who "came near me in a quick motion, and I struck him." Defendant then returned to his car and drove away. . . .

After being arrested on December 4, defendant told police that he did not kill anyone and that he did not recall leaving his engine running or taking the car club with him when he searched for his brother. He admitted hitting Segal on the head with the car club, but maintained that he did not know the identity of the person he hit. He denied hitting Segal from behind, claiming that Segal was on his left. He struck Segal because he believed he was being attacked, but "As it turns out, [Segal] didn't have anything to do with the prior beating and robbery."

*People v. Alas*, No. A107662, 2006 WL 218206, at *1-3 (Cal. Ct. App. Jan. 30, 2006).

In August of 1999, petitioner was charged with murder and with the personal use of a deadly weapon in the commission of a felony. After he was convicted by a jury of second degree murder with use of a deadly weapon, the California Court of Appeal set aside the conviction "due to issues relating to the trial court's dismissal of a juror for misconduct during deliberations." *Id*. at *4. Petitioner was then retried and convicted of the same charges, and the court imposed a sentence of 36 years to life. Petitioner appealed his conviction and sentence to the California Court of Appeal, which issued an opinion affirming the lower court on January 30, 2006. Petitioner filed a petition for review with the California Supreme Court, which that court denied on April 26, 2006. On July 25, 2007, petitioner filed

3

a writ of habeas corpus in this Court pursuant to 28 U.S.C. § 2254.

**STANDARD OF REVIEW**

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus if the

> adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A decision is contrary to established law if it applies a rule that contradicts the law as set forth by the Supreme Court, or arrives at a different result in a case that is "materially indistinguishable" from a Supreme Court decision. *Penry v. Johnson*, 532 U.S. 782, 792 (2001). Unreasonable application of established law occurs when the court "correctly identifies the governing legal rule but applies it unreasonably to the facts." *Id.* Under AEDPA, although Supreme Court precedent is the only controlling authority, Ninth Circuit case law is persuasive authority for the purposes of review of previous state court decisions. *See Luna v. Cambra*, 306 F.3d 954, 960 (9th Cir. 2002), *amended by* 311 F.3d 928 (9th Cir. 2002).

In reviewing a habeas corpus petition, a federal court must determine whether the last reasoned decision of the state court was contrary to or an unreasonable application of established federal law. *Id.* at 960-61. Here, the last reasoned decision of the state court is the California Court of Appeal's decision of January 30, 2006.

**DISCUSSION**

**I.  Exclusion of expert witness's testimony**

At petitioner's first trial, Dr. Randall Baselt, a forensic toxicologist, testified on petitioner's behalf regarding the defense of voluntary intoxication. Dr. Baselt's testimony was in part based on a hypothetical which outlined petitioner's consumption of alcohol and prescription drugs on the date of the offense. The Court of Appeal described the evidence, and Dr. Baselt's testimony at the first trial, as follows:

4

> The evidence in the record at the first trial supported the hypothetical questions posed to Dr. Baselt – defendant detailed how many beers he drank and at what time those beers were consumed on November 21. Based upon that evidence, Dr. Baselt prepared a chart showing the level of defendant's alcohol consumption and his level of intoxication. He opined that defendant had a blood alcohol level of .25 percent at the time of the homicide, based upon a set of assumptions regarding what specific alcohol defendant consumed at specific times on November 21. A hypothetical question was then posed, which assumed defendant's blood alcohol level to be .25 percent, and further assumed defendant's behavioral instability, the situation involving the confrontation with the occupants of the Volkswagen, his stormy relationship with his girlfriend, and his difficulty with anxiety. Dr. Baselt opined that it was "hard to predict" what would happen in defendant's mind, given all these facts. Various other questions were asked, assuming that someone had a .25 percent blood alcohol level, an individual could, but would not necessarily, have a fragmented memory. He concluded that most people would have slurred speech and trouble with their balance, if they consumed 11 beers in four and one half hours.
>
> Baselt also testified as to the general effects of alcohol on the human body, and the normal alcohol absorption and burn-off rates. He also testified regarding the effect of Trazodone (a depressant) and Prozac (a stimulant, that increases alertness and concentration and can cause confusion). He also opined that certain portions of defendant's behavior on the evening in question were inconsistent with one being confused and disoriented due to alcohol consumption, including walking through a group of 30 people to hit a particular person, using a deadly weapon by coming from behind the victim and hitting the victim in the head, and running to his van afterwards.

*Alas*, 2006 WL 218206, at*5 & n.8.

Dr. Baselt did not testify at the second trial. Defense counsel was unable to locate Dr. Baselt, and instead sought to admit his testimony from the first trial into evidence. The trial court denied the request on the ground that the defense had not laid a proper foundation for Dr. Baselt's testimony. The California Court of Appeal affirmed the trial court's ruling, finding that petitioner's counsel did not lay the same foundation for Baselt's testimony in the second trial as was laid in the first trial. The court stated:

> At defendant's second trial, the defense did not lay an adequate foundation for admission of the vast majority of Dr. Baselt's prior testimony. As defendant here concedes, "all the hypothetical facts forming the basis for Baselt's prior testimony were not presented to the jury in this case," including defendant's seven-year history of alcohol and drug abuse, the fact that he was taking Prozac and was prescribed Trazodone, and the particular pattern of his drinking on November 21. Absent this foundation being laid, the trial court properly exercised its discretion not to admit Dr. Baselt's former testimony.

*Id*. at \*6. The California Court of Appeal also rejected petitioner's contention that the trial court should have *sua sponte* redacted the expert's testimony so as to admit only those portions for which a proper foundation had been laid: "Even assuming that Baselt's former testimony could be redacted to

5

eliminate all opinions in these areas which were premised upon defendant having a .25 percent blood alcohol level at the time of the homicide (which opinion was based upon defendant's testimony in the first trial, missing in the second, as to his specific drinking pattern), defendant has cited no authority, nor are we aware of any, requiring the trial court to *sua sponte* make such redactions." *Id*.

Petitioner contends that by excluding Dr. Baselt's testimony during the second trial, the trial court violated his constitutional rights to a fair trial and to present a defense because he was unable to present critical corroborative evidence on the intoxication defense. Petitioner argues that there was an adequate foundation laid for Dr. Baselt's testimony because there was "ample testimony" on the amount of alcohol petitioner had consumed. Petitioner also asserts that "[w]hile evidence of petitioner's history of drug and alcohol abuse was not before the [second] jury, this should not have barred presentation of Baselt's testimony, if necessary in redacted form to remove those portions not relevant to the present trial." Petition at 10.

The exclusion of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. *Dillard v. Roe*, 244 F.3d 758, 766 (9th Cir. 2001); *Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir. 1998). As such, petitioner prevails on this claim only if he has demonstrated that the trial court's exclusion of Dr. Baselt's testimony amounted to an unconstitutional denial of due process. The Due Process Clause does not guarantee the right to introduce all relevant evidence, *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996), nor does it "permit federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules." *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983). Rather, to show that his due process rights were violated, petitioner bears the burden of demonstrating that California's evidentiary rule violates some principle "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Egelhoff*, 518 U.S. at 43 (quoting *Patterson v. New York*, 432 U.S. 197, 202 (1977)).

The Court concludes that petitioner has not demonstrated that the exclusion of Dr. Baselt's former testimony amounted to a constitutional violation. "The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410 (1998). Here, the trial court excluded Dr. Baselt's

former testimony because the foundation laid during the first trial – including evidence of petitioner's seven year history of drug and alcohol abuse, his prescription medications, and his specific drinking pattern on the day of the offense – was not presented during the second trial. Moreover, as the California Court of Appeal recognized, "[t]he trial court in no way prevented defendant from presenting expert testimony – defendant could have called any other expert in the field to testify. The trial court merely exercised its discretion not to admit expert testimony for which an insufficient foundation had been laid." *Alas*, 2006 WL 218206, at \*6 n.9; *cf. Egelhoff*, 518 U.S. at 51 (holding that right to have jury consider evidence of voluntary intoxication in determining whether accused possessed mental state required for conviction was not "fundamental principle of justice," and therefore, that Montana's statutory ban on consideration of such evidence did not violate due process clause).

## II. Ineffective assistance of counsel

Petitioner asserts that trial counsel's assistance was ineffective because he failed to secure an expert to replace Dr. Baselt, failed to ensure that the facts underlying Dr. Baselt's hypothetical were presented at trial, and failed to request that the trial court admit Dr. Baselt's testimony after redacting the portions that lacked foundation.

The Court of Appeal rejected petitioner's ineffective assistance of counsel claim. The court held that petitioner had not demonstrated that his counsel's performance was objectively unreasonable. The court noted that "[a] record which is silent as to why counsel acted or failed to act in the manner challenged will not suffice, unless there simply could be no satisfactory explanation for counsel's conduct." *Alas*, 2006 WL 218206, at \*6 (internal quotation omitted).

> Here, we have nothing in the record that indicates why trial counsel elected not to secure another expert witness regarding the effects of alcohol, once Dr. Baselt's former testimony was ruled inadmissible. As respondent notes, defense counsel could well have decided that since the defense presented through Dr. Baselt was not successful in the first trial, it was not advisable tactically to locate another expert to try it again. As to the hypothetical portion of Baselt's testimony, perhaps in weighing the effect of introducing foundational evidence relating to defendant's violence toward his girlfriend the day before the homicide, defendant's anger management issues, and his long alcohol and drug abuse problems, against the potential impact of an expert's testimony, defense counsel made the tactical choice not to call an expert. While counsel renewed his motion to introduce the former testimony prior to the close of the defense case, as noted in defendant's reply brief, that does not negate the possibility that such a tactical choice was made. Counsel could have renewed the motion to introduce the former testimony

7

> of Baselt to further preserve the issue for appeal. Counsel could well have decided that, given the state of the evidence of the second trial, he was better off not pursuing the expert testimony. . . . As to counsel's failure to ask the court to redact those portions of Baselt's prior testimony not supported by the record in the current case, and admit the remainder, as indicated earlier that would have resulted in very little of his former testimony going to the jury. His chart calculating defendant's blood alcohol content at the time of the homicide was based on very specific facts in the record of the first trial about what alcohol defendant consumed at what particular time that day, plus other facts not established in the second trial. . . . Counsel may well have decided that redaction simply was not a viable course.

*Id*. at *7. The California Court of Appeal also held that petitioner failed to demonstrate prejudice:

> First and foremost, the defense he complains of counsel not presenting in the second trial was presented, unsuccessfully, in the first. Defendant has not demonstrated why or how presenting the same defense in the second trial would have obtained a better result. Second, there was overwhelming evidence to support the verdict of second degree murder, including several witnesses who observed defendant parking his van, leaving the engine running and the lights on, taking a car club with him, crossing the street, walking through a crowd of people standing in front of the club, picking victim Segal out of the crowd (coincidentally the person with whom he was involved in an earlier confrontation), and striking a blow to Segal's head with enough force to kill him. This evidence, also presented at the first trial, tended to negate the intoxication defense presented the first time around.

*Id*.

To establish ineffective assistance of counsel, petitioner must first show that his counsel's performance fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Second, he must establish that he was prejudiced by counsel's deficient performance by demonstrating "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. The Court in *Strickland* emphasized the requirement that judicial scrutiny of counsel's performance be highly deferential, and a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Id*. at 689; *Wildman v. Johnson*, 261 F.3d 832, 838 (9th Cir. 2001). Because habeas relief is available only upon a showing that the state court's holding was "contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d), the Court's review of petitioner's ineffective assistance of counsel claim must be "doubly deferential." *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) (per curiam). In other words, the Court must analyze whether the California Court of Appeal, in "applying a heavy measure of deference to counsel's judgment," *Strickland*, 466 U.S. at 690, strayed so far from established Supreme Court

precedent that its decision "was contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d).

Petitioner contends that "[d]efense counsel could have had no tactical purpose for . . . [failing to] ensure testimony on voluntary intoxication was heard by the jury." Pet. at 12. In rejecting this argument on appeal, the Court of Appeal noted that "defense counsel could well have decided that since the defense presented through Dr. Baselt was not successful in the first trial, it was not advisable tactically to locate another expert to try it again." *Alas*, 2006 WL 218206, at *7. Indeed, the hypothetical in Dr. Baselt's testimony not only outlined petitioner's excessive consumption of alcohol on the date of the offense, but also his propensity toward violence and his anger management issues. *Id*. at *7. It would not have been unreasonable for counsel to make the conscious tactical choice to omit this testimony to avoid tainting the jury's image of his client, especially in light of the first jury's decision to convict after hearing the testimony. As such, the California Court of Appeal was not unreasonable in concluding that petitioner had failed to demonstrate that counsel's decision fell below an objective standard of reasonableness.

Although is unnecessary for a federal court considering a habeas ineffective assistance claim to address the prejudice prong of the *Strickland* test if the petitioner does not establish incompetence under the first prong, *Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998), the Court concludes that petitioner also has not demonstrated prejudice. Petitioner asserts that his first guilty verdict was overturned on appeal due to the trial court's removal of a "holdout" juror who did not agree with the majority. Traverse at 6. Petitioner speculates that he never would have been convicted in the first trial had this juror not been removed. Because "the expert testimony may well have convinced that juror that petitioner was not guilty," *id*, petitioner argues that he was prejudiced under the second *Strickland* prong by the juror's removal.

The Court finds nothing in the record supporting petitioner's assertion that a "holdout" juror was removed during the first trial because he or she did not agree with the majority. Because the California Court of Appeal's opinion reversing petitioner's first conviction was not published nor submitted to the Court, the Court must look to the Court of Appeal's brief explanation in the second case for the juror's dismissal: "The conviction was set aside by this court, due to issues relating to the

9

trial court's dismissal of a juror for misconduct during deliberations." *Alas*, 2006 WL 218206, at *4. From this language, the Court cannot conclude that the juror's dismissal was in any way related to his or her reluctance to convict petitioner.

Moreover, as the California Court of Appeal noted, the jury's verdict of second degree murder was supported by substantial evidence: eyewitnesses testified that petitioner left the strip club after he was denied admission, he returned ten to fifteen minutes later with a car club, and he raised his hand and struck the victim in the back of his head while his back was turned. *Alas*, 2006 WL 218206, at *2. Petitioner has failed to meet his burden of showing "a reasonable probability" that counsel's decision regarding the expert testimony about voluntary intoxication, or the court's dismissal of one juror, affected the outcome of the trial. *Strickland*, 466 U.S. at 694. The Court of Appeal's conclusion that petitioner "has not demonstrated why or how presenting the same defense in the second trial would have obtained a better result," *Alas*, 2006 WL 218206, at *7, does not constitute an unreasonable application of federal law.

**III.    The trial court's remark to defense counsel**

After concluding cross examination of prosecution witness Melvin Watson, defense counsel stated, "Just one more thing. I apologize." Rep.'s Tr. Proceedings at 180. The trial court admonished defense counsel: "Counsel, I've warned you before. You are running the show, here; not the defendant. You are the only person here of the two of you licensed to practice law, as far as I know." *Id.* Counsel did not object to the court's statement. *Id.* Petitioner claims that this remark to his counsel during the cross examination "enormously impacted . . . the jury," violating his right to a fair trial. Pet. at 13.

The California Court of Appeal held that petitioner's failure to contemporaneously object to the court's remark rendered the claim procedurally barred. *Alas*, 2006 WL 218206, at *8; *see also* Cal. Evid. Code § 353 (requiring that "an objection to or a motion to exclude or to strike the evidence . . . [be] timely made and so stated as to make clear the specific ground for the objection or motion"). However, the California Court of Appeal briefly addressed the merits of petitioner's claim:

[Petitioner] has not demonstrated that this one isolated comment disparaged defense

10

> counsel to the degree that it denied him the right to a fair trial, as opposed to being a fair comment intended to control the proceedings. [Petitioner] has cited us to no case where such a relatively innocuous comment by a trial judge, in isolation, was found to constitute misconduct and require reversal because it denied defendant a fair trial.

*Alas*, 2006 WL 218206, at *8.

As the Court agrees with the California Court of Appeal as to the merits of petitioner's claim, it need not address whether the claim is procedurally barred by California's contemporaneous objection rule. To prevail on his claim that the trial court's comment unduly prejudiced the jury, petitioner must demonstrate that the remark either "reveal[s] an opinion that derives from an extrajudicial source, . . . or reveal[s] such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994). The Supreme Court in *Liteky* expressly stated that "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Id*. Impartiality is not demonstrated by "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women . . . sometimes display." *Id*. at 555-56.

Petitioner has not shown that the trial court's remark deprived him of his right to a fair trial. The Court disagrees with petitioner's assertion that the remark "cast serious aspersion on defense counsel's handling of the case, as well as on the case itself." Traverse at 8. On the contrary, the trial court's remark is precisely an "expression[] of impatience, dissatisfaction, annoyance, [or] even anger" that does not establish favoritism, antagonism, or impartiality. *Liteky*, 510 U.S. at 555-56.

**IV.    Voluntary manslaughter jury instruction**

After trial had ended and jury deliberations had begun, the jury sent a note to the court which read: "A juror would like the definition of 'intentional act' as it applies to this trial versus 'intent to kill,' clarified. Specifically, in implied malice, does the intention pertain to the act of striking the victim, or must it also include the intention that the blow would be fatal?" Rep.'s Tr. Proceedings at 536. In response, the court instructed the jury to read two California jury instructions. *Id*. at 536-37. The first, defining both express and implied malice, read: "When it is shown that a killing resulted from

the intentional doing of an act with express or implied malice, no other mental state need be shown to establish the mental state of malice aforethought." CALJIC No. 8.11 (6th ed. 1996). The second instruction, which defines second degree implied malice murder, read:

> Murder of the second degree is [also] the unlawful killing of a human being when:
> 1    The killing resulted from an intentional act,
> 2    The natural consequences of the act are dangerous to human life, and
> 3    The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.
> When the killing is the direct result of such an act, it is not necessary to prove that the defendant intended that the act would result in the death of a human being.

CALJIC 8.31 (6th ed. 1996) (bracketed portion in original).

Defense counsel requested that the court also instruct the jury to reread the instruction on voluntary manslaughter. That instruction read:

> . . . Every person who unlawfully kills another human being without malice aforethought but with an intent to kill, is guilty of voluntary manslaughter . . . .
> There is no malice aforethought if the killing occurred [upon a sudden quarrel or heat of passion] [or] [in the actual but unreasonable belief in the necessity to defend oneself against imminent peril to life or great bodily injury].
> In order to prove this crime, each of the following elements must be proved:
> 1    A human being was killed;
> 2    The killing was unlawful; and
> 3    The killing was done with the intent to kill.
> [A killing is unlawful, if it was [neither] [not] [justifiable] [nor] [excusable].]

CALJIC No. 8.40 (6th ed. 1996) (bracketed portions in original). The trial court denied the defense's request.

The California Court of Appeal held that the trial court did not abuse its discretion in deciding not to instruct the jury to reread the voluntary manslaughter instruction. "In the present case, the jury asked a very specific question about the definition of 'intentional act' during deliberations . . . ." *Alas*, 2006 WL 218206, at *9. The court held that the jury's question was adequately and fully addressed in the two instructions that the trial court instructed the jury to reread. *Id*. "The jury's question related only to the definition of intentional act for implied malice second degree murder; it did not ask anything about manslaughter. The jury expressed no confusion regarding the distinction between murder and manslaughter." *Id*.

The Court finds that petitioner has not demonstrated that the failure to instruct the jury to reread the voluntary manslaughter instruction violated petitioner's right to due process. As explained by the

12

California Court of Appeal, the jury's question – whether implied malice required that petitioner intended that the blow be fatal – was fully addressed in the two instructions that were reread, and would not have been addressed by the voluntary manslaughter instruction. The voluntary manslaughter instruction demonstrates that a defendant may only be convicted if the act was committed *without* malice. .

## CONCLUSION

For the foregoing reasons, the Court DENIES petitioner's petition for writ of habeas corpus. (Docket No. 1).

**IT IS SO ORDERED.**

Dated: February 11, 2009

SUSAN ILLSTON
United States District Judge